UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KYLE DAVID BIEDMA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>MICHAEL CLARK, et al.,<br><br>　　　　Defendants. | Case No. 14-cv-02853-RS<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

## I.　INTRODUCTION

Plaintiff Kyle David Biedma was in the wrong place at the wrong time. Unfortunately for him, the "wrong place" was the side yard of his mother's house, where he was living, and the "wrong time" was when the police were attempting to apprehend Eric Pineda Diaz, a felon on the loose. The upshot was that Santa Rosa Police Department ("SRPD") canine Taz sunk his teeth into Biedma's arm and pulled him to the ground. Defendant Officer Michael Clark gave the order to attack. The SRPD officers soon understood that they had made a mistake and called for an ambulance to take Biedma to the hospital to treat his wounds. Clark followed Biedma to the hospital, where he explained to him why he ordered Taz to attack. During that conversation, Clark asked Biedma to confirm the officer's version of what happened before the dog bite, but Biedma had in many respects a different recollection.

The next day, Clark drafted an incident report recounting the events of the previous night. In it, Clark wrote that the case should be referred to the Santa Rosa County District Attorney to consider filing charges for resisting arrest. The prosecutor followed the recommendation and

charged Biedma with the criminal offense of resisting arrest. After a trial, the jury acquitted Biedma of the charge.

Biedma initially filed this lawsuit in state court and the defendants removed the action. After motion practice, Biedma filed a Second Amended Complaint ("SAC") advancing five claims for relief. Defendants move for for summary judgment with respect to Claim 3 (false imprisonment under California law) and Claim 5 (federal constitutional rights violations). In the SAC, Biedma offers numerous theories, under his fifth claim, as to how defendants violated his constitutional rights, including violations of the Fourth Amendment[1] of the U.S. Constitution, in particular: (1) that defendants conducted a search of his home without a warrant or probable cause in violation of the Fourth Amendment; (2) that defendants seized him without probable cause; (3) that defendants used unreasonable force to seize him; (4) that defendants unreasonably detained him at the hospital; and (5) that Clark maliciously caused his prosecution.[2] In addition, Biedma claims that defendants violated the Fifth and Sixth Amendments by interrogating him in custody without informing him of his constitutional rights. Defendants argue that no reasonable jury could find that they violated the Fourth Amendment under all but one of these theories; they have not moved for summary judgment on Biedma's unreasonable force claim.

Biedma concedes that he cannot prevail on his claims relative to his interrogation under the Fifth and Sixth Amendments, and therefore summary judgment must be entered in defendants favor. Defendants have demonstrated that exigent circumstances justified entering into the curtilage of Biedma's home, and so their motion for summary judgment is granted with respect to Biedma's claim that they violated the Fourth Amendment when they entered his property.

---

[1] The SAC references violations of the Fourth and Fourteenth Amendment. Given that defendants are county and not federal employees, Biedma's reference to the Fourteenth Amendment is apparently a mere acknowledgement that the Fourteenth Amendment makes the provisions of the Fourth, Fifth, and Sixth Amendment rights at issue applicable to county and state actors. He does not assert a freestanding Fourteenth Amendment claim.

[2] Biedma also avers that Clark's role in causing Biedma's prosecution for resisting arrest violated the First and Eighth Amendments. Defendants do not challenge these theories of liability.

1   Material disputes of fact remain, however, with respect to Claim 3 (false imprisonment) and those

2   parts of Claim 5 alleging an unreasonable seizure and malicious prosecution under the Fourth

3   Amendment.  Because defendants did not challenge Biedma's additional grounds under the Fifth

4   Claim for Relief—that they used unreasonable force—the jury will consider that claim, as well.

## II.   FACTS AND PROCEDURAL HISTORY

On April 6, 2013, the SRPD officers were searching for Eric Pineda Diaz who was wanted for corporal injury on a spouse, violation of felony probation, grand theft, participating in a street gang, and misdemeanor vandalism.  Clark Decl. ¶ 4.  SRPD officers learned that Diaz was hiding at 950 Kingwood Street in Santa Rosa, and so they positioned themselves near the front and back of the house.  Clark believed Diaz would try to escape through the back door and run through Biedma's back yard.  To block this escape route Clark, Taz, and Officer Gillotte stood in the fenced back yard of 927 Saracen, Biedma's home, adjacent to 950 Kingwood.  Clark Decl. ¶ 8. 927 Saracen had a metal gate, which Clark expected Diaz to jump over in the event of an escape. Officers Isachsen and Snetsinger stood near the driveway of 925 Saracen, the house to the south of 927 Saracen.  Clark Decl. Ex. J, Incident Report.

Around 11:45 p.m., Biedma woke up and decided to smoke a cigarette.  He went to retrieve them from his car, which was parked near the back of the house.  Grady Decl. Ex. 1, Tr. Criminal Trial at 100:20-101:8.  He threw on a black hoodie over the red basketball shorts he was wearing and put on black tennis shoes before going outside.  *Id.* at 101:16-21.  At approximately the same time, Clark heard another officer knock on the door of 950 Kingwood and order Diaz to surrender.  Soon thereafter, he heard a sound of someone moving the metal fence in the back yard at 927 Saracen.  Clark Decl. ¶ 10.  No lights illuminated the back yard of 927 Saracen, which accordingly was very dark.  *Id.* ¶ 11; Tr. Criminal Trial at 103:11-17.  As Biedma was walking to his car, Isachsen briefly shined a flashlight on him from a distance.  Clark Decl. Ex. J, Incident Report.  Biedma saw the light, thought nothing of it, and kept walking at a casual pace towards his car.  Tr. Criminal Trial at 103:18-104: 5.  There is considerable disagreement about what occurred next.

1    Clark insists he thought Biedma was Diaz because the two men are approximately the
2    same height, weight, and age, and the red shorts appeared to be the same color associated with
3    Diaz's gang. Biedma's face was slightly obstructed because his hood was over his head.
4    Biedma's hands were in the front pouch of the hoodie. Clark Decl. ¶ 11. Clark claims that he
5    identified himself as a police officer and ordered Biedma to get on the ground. *Id.* ¶ 12.
6    According to Clark, Biedma kept walking, so he shined the light on himself and Taz and warned
7    Biedma that Taz would be ordered to bite if Biedma did not stop. Clark Decl. ¶ 13. Biedma did
8    not stop walking. *Id.* In the incident report, Clark wrote that Biedma "said something" and
9    continued to walk "as if to try and pass . . . on the left side." Clark Decl. Ex. J, Incident Report.
10   Clark insists that he told Biedma to get onto the ground two or three more times and that Gillotte
11   also issued such a command. Clark Decl. ¶ 12. Gillote, however, denies that he commanded
12   Biedma to get down. Gillotte Dep. at 73:21-22. When Biedma did not stop, Clark released Taz,
13   who bit Biedma's arm and brought him to the ground. Clark originally stated that only fifteen
14   seconds elapsed between his first sighting of Biedma and his release of Taz, with at the time
15   approximately three feet between them. Tr. Criminal Trial at 76:2-7.

16   Biedma has a very different recollection of events. At his criminal trial Biedma testified
17   that, while he was walking to his car, he suddenly heard someone order him to get down on the
18   ground. Upon hearing the command he immediately stopped walking and put his hands in the air.
19   *Id.* at 104:6-15; Grady Decl. Ex. 2, Biedma Dep. at 37:17-21. Approximately three seconds later,
20   Taz bit his arm and pulled him to the ground. Tr. Criminal Trial 104:20-24; Biedma Dep. at
21   42:22-25, 45:22-25. Biedma denies that Clark or any other officer ordered him to lie on the
22   ground more than once. Tr. Criminal Trial at 107:23-25; Biedma Dep. 59:20-24. He also denies
23   that the officers identified themselves as police officers, that Clark illuminated himself, or that
24   Clark warned him that Taz would bite. Tr. Criminal Trial at 107:26-108:11, 111:11-23.

25   Once Biedma was on the ground, the officers realized he was not their target. They called
26   an ambulance to attend to Biedma's wounds, and medical personnel transported him to the
27   hospital for treatment. Clark followed Biedma to the hospital, where they spoke about the incident

28   ORDER REGARDING MOTION FOR SUMMARY JUDGMENT
     CASE NO. 14-cv-02853-RS
     4

United States District Court
Northern District of California

while Biedma received medical treatment. Clark recorded parts of the conversation with a body camera.[3] In his declaration, Clark states that his "intent was to explain what happened." Clark Decl. ¶ 17. At his deposition, however, Clark said that he had already decided to write a report of the incident and refer the case to a prosecutor for possible prosecution for resisting arrest. Clark Dep. (Rough Tr.) at 133:9-14.

In the hospital, Biedma started by explaining his side of the story:

> I walked out, and I saw—I saw the officers off in the distance, shining a flashlight at me. . . . So I thought nothing of it. I was like, okay, well maybe something's going on over there that I don't understand. I'm just doing my own thing, going to my car, and then bam, ran into you. . . . You know, "Get on the ground." And I was, like, so startled man. I was just like, whoa. You know, believe me, I had my keys and my phone in my—my hand. And I was like—I wanted to get on the ground, I guess I just didn't get on the ground fast enough.

Clark Decl. Ex. H, Tr. Interrogation at 2:11-3:2. Clark interjected to ask Biedma if he had responded to the command to get down by saying "fuck you," which Biedma denied. *Id.* at 3:3-6. Clark also described Diaz's crimes, why the police were conducting surveillance around Biedma's home, and how he came to be mistaken for Diaz. Clark showed Diaz's picture to Biedma, who disagreed with the notion that Diaz looked anything like him. *See id.* at 6:1-14. Near the end of the conversation, Biedma thanked Clark for the explanation and said, "that dog fucked me up, man." "It would have been one thing, if, like he just bit my arm, and I was probably trying to hit him or something. But I got down on the ground because obviously you all were there, so . . . . And he continued to maul my arm, so . . . ." *Id.* at 8:12-9:2. As the conversation wound down, Clark told Biedma that they could be "blood brothers" because they have the same scars and "[c]hicks dig scars." *Id.* 9:24-25. Clark left Biedma a detention certificate pursuant to Santa Rosa Penal Code Section 849.5, which requires documentation of any arrest and release without filing an accusatory pleading. *See* Clark Ex. I, Detention Cert.

---

[3] The video begins while Biedma is speaking. The video does not establish whether Biedma consented to being recorded or knew that Clark was videotaping the interaction.

ORDER REGARDING MOTION FOR SUMMARY JUDGMENT
CASE NO. 14-cv-02853-RS

1   The next day, Clark drafted the incident report, which he forwarded to the Santa Rosa
2   District Attorney to determine whether to file charges for resisting arrest. Shortly after the
3   incident, Biedma contacted a civil attorney to discuss what had happened. Biedma Decl. ¶ 6. On
4   April 17, 2013, Biedma's attorney sent a Public Records Act request to the Santa Rosa Police
5   Department for records and information about the April 6 incident. Biedma Decl. Ex. 3.
6   Sometime in late April or early May, a Santa Rosa County district attorney charged Biedma with
7   resisting arrest. Clark did not receive a request for further investigation or meet with the district
8   attorney before the prosecutor charged Biedma with resisting arrest.[4] Clark Dep. at 131:17-22.
9   Biedma exercised his right to a jury trial and to testify. Clark, Gillotte, and Isachsen also
10  testified at the criminal trial. After an hour of deliberation, the jury acquitted Biedma, thereby
11  eliminating the bar to pursuing claims for damages under § 1983. *See Heck v. Humphrey*, 512
12  U.S. 477, 486-87 (1994). This suit followed shortly thereafter.

### III.   LEGAL STANDARD

A party is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party who seeks summary judgment bears the initial responsibility of identifying an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies this initial burden, the non-moving party must present specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. "Only disputes over facts that might affect the outcome of the suit under governing law" are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue exists if the non-moving party presents evidence from which a reasonable fact-finder, viewing the evidence in

---

[4] Biedma has sent subpoenas to the Santa Rosa County District Attorney's office, seeking information about whether the prosecutor conducted any independent investigation. The district attorney has filed a motion to quash the subpoena. Thomas Gotshall, the prosecutor who tried the case, insists that he did not make the decision to prosecute Biedma. Gotshall Decl. ¶ 6. William Bockley, an assistant district attorney in Santa Rosa, reviewed Biedma's file and determined that the charging prosecutor no longer works for the Santa Rosa D.A.'s office and cannot be located. Bockley Decl. ¶¶ 5-6.

the light most favorable to that party, could resolve the material issue in his or her favor. *Id.* at 248-49.[5]

### IV.   DISCUSSION

#### A.  Claim 3: California False Imprisonment

Under California law, a police officer may be liable for false arrest or imprisonment by confining another "without lawful privilege." *Asgari v. City of Los Angeles*, 15 Cal. 4th. 744, 757 (1997) (internal quotation marks omitted). "A warrantless arrest by a peace officer for a misdemeanor is lawful only if the officer has reasonable cause to believe the misdemeanor was committed in the officer's presence." *Johanson v. Dep't of Motor Vehicles*, 36 Cal.App.4th 1209, 1216 (1995); *see also* Cal. Penal Code § 836(a).

Here, there are significant disputes of material fact as to whether Clark had reasonable cause to believe Biedma was resisting arrest. Clark and Biedma offer conflicting narratives about how many times the officers told him to lie down on the ground, whether the officers identified themselves, and the time that transpired between the order to lie on the ground and the release of the dog. If a jury believes Biedma's version of events, which indeed the criminal jury may have, then Clark did not have a reasonable basis to arrest Biedma for resisting arrest.

Defendants also contend that they had reason to believe Biedma was Diaz, and therefore the arrest was proper. "A police officer must use reasonable prudence and diligence to determine whether a party being arrested is the one described in the warrant." *Lopez v. City of Oxnard*, 207 Cal. App. 3d 1, 7 (1989). "The duty unquestionably rests upon an officer to promptly execute a warrant but the officer also owes a duty to the public and to the party about to be arrested. If he carelessly arrests the wrong party he is liable for the damages caused." *Smith v. Madruga*, 193 Cal. App. 2d 543, 546 (1961) (internal quotation marks omitted).

---

[5] Defendants do not argue that qualified immunity compels entry of summary judgment in their favor. They focus exclusively on whether Biedma can prove a constitutional violation without ever referencing whether the law was clearly established at the time of the alleged violation. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Because defendants did not raise the issue of qualified immunity, the court will not address it.

A reasonable jury could find that Clark unreasonably concluded Biedma was Diaz. Although it was dark outside, Clark stated with certainty that he had a good look at Biedma and was certain he saw Diaz. Tr. Criminal Trial at 57:25-26. Although Biedma's hoodie was above his head, Clark noted that he could see Biedma's facial hair, and there are considerable differences between Biedma's appearance and that of Diaz. The latter has darker skin complexion than Biedma, a very large, visible neck tattoo, thick eyebrows, a straight hairline, and full lips. In contrast, Biedma does not have any visible tattoos, has a widow's-peak hairline, thin lips, and thin eyebrows. *Compare* Clark Decl. Ex. D, Diaz Photo, *with id.* Ex. L, Biedma Photo. A jury might conclude that Clark could have identified the differences had he looked more carefully. Accordingly, the motion for summary judgment must be denied.

### B. Claim 5: Fourth Amendment Violations

*1. Unreasonable Seizure by Dog Bite*

Like claims for false imprisonment under California law, whether an officer unlawfully seizes a person in violation of the Fourth Amendment turns on "whether the arresting officer[] had a good faith, reasonable belief that the arrestee was the subject of the warrant." *Rivera v. Cty. of Los Angeles*, 745 F.3d 384, 389 (9th Cir. 2014) (citing *Hill v. California*, 401 U.S. 797, 804 (1971)). For the reasons discussed above, a reasonable jury could conclude Clark did not have a basis to believe Biedma was resisting arrest or that he was Diaz. Accordingly, defendants' motion to dismiss the Fifth Claim for Relief on this theory must be denied.

*2. Unreasonable Seizure at the Hospital*

The SAC avers that defendants subjected Biedma to an unreasonable seizure when Clark spoke with him in the hospital. Biedma now concedes that no reasonable jury could conclude that Clark unreasonably detained him, and therefore summary judgment must be entered for defendants on this theory of liability.

**3.** *Malicious Prosecution*

Ordinarily, "[a] prosecutor's independent judgment may break the chain of causation between the unconstitutional actions of other officials and the harm suffered by a constitutional

1    tort plaintiff." *Beck v. City of Upland*, 527 F.3d 853, 862 (9th Cir. 2008). Therefore, even if an

2    officer makes an arrest without probable cause in violation of the Fourth Amendment, he cannot

3    be held liable for malicious prosecution unless the plaintiff offers evidence to rebut the

4    presumption of prosecutorial independence. *See id.* at 862-64. Evidence that the prosecutor did

5    not exercise independent judgment may include, (1) "the prosecutor was pressured by police or

6    was given false information"; (2) "the prosecutor relied on the police investigation and arrest when

7    he filed the complaint instead of making an independent judgment on the existence of probable

8    cause for the arrest"; or "(3) the officers otherwise engaged in wrongful or bad faith conduct that

9    was actively instrumental in causing the initiation of legal proceedings." *Beck*, 527 F.3d at 862-63

10   (internal quotation marks, alteration, footnote, and citations omitted). "[A] plaintiff's account of

11   the incident in question, by itself, does not overcome the presumption of independent judgment."

12   *Newman v. Cty. of Orange*, 457 F.3d 991, 994 (9th Cir. 2006) (emphasis omitted).

13       Biedma has presented evidence from which a reasonable juror could conclude that the

14   prosecutor relied on Clark's report to file the criminal charges without conducting an independent

15   investigation. The Santa Rosa District Attorney's office occasionally sends requests for further

16   investigation before filing criminal charges. Clark Dep. at 131:17-22. The record reflects no such

17   request by the district attorney to prepare for Biedma's case. *Id.* Moreover, Clark could not recall

18   whether he met with the prosecutor before Biedma's criminal trial and could not recall responding

19   to any requests from the prosecutor before receiving the subpoena to testify. *Id.* at 127:11-24.

20       Critically, Biedma does not currently have access to information about the prosecutor's

21   decisionmaking process. Biedma has sent subpoenas to the Santa Rosa District Attorney's office

22   to uncover evidence of any pre-charging investigation, but the district attorney has moved to quash

23   the subpoena. When "invocations of privilege render 'relevant evidence' concerning the

24   prosecutor's decision to prosecute unavailable, no presumption of prosecutorial independence

25   arises, and the plaintiff need not rebut it." *Beck*, 527 F.3d at 869 (quoting *Smiddy v. Varney*, 665

26   F.2d 261, 267-68 (9th Cir. 1981), *overruled on other grounds by Beck*, 527 F.3d at 865). Nothing

27   in the record suggests that the prosecutor conducted any independent investigation, and so the

Santa Rosa District Attorney's invocation of privilege undermines Biedma's ability to prove his case. As such, defendants cannot rely on the presumption of independence.

That the prosecutor relied upon the incident report alone does not end the inquiry; Biedma must also present evidence other than his testimony from which a jury could reasonably conclude that Clark submitted a false report. *Newman*, 457 F.3d at 994. Biedma has met that burden. To start, there are some inconsistencies between the report and Clark's subsequent testimony. In the report, Clark wrote that Gillote ordered Biedma to lie down on the ground. Clark Ex. J., Incident Report. At his deposition, Gillote denied ever giving a verbal order. Gillote Dep. at 73:21-25. In addition, Clark initially testified that Biedma closed ten feet in ten seconds during which Clark supposedly illuminated himself and Taz and issued multiple warnings.[6] Tr. Criminal Trial at 76:2-7. Biedma points out that a jury may conclude Clark would not have had enough time to do all of this in such a short time window while still maintaining control of Taz.

Biedma also challenges whether Clark decided to forward the case to the prosecutor before or after speaking with him in the hospital. He suggests that Clark submitted a false report and urged criminal prosecution so as to immunize himself from civil liability. Biedma notes that Clark did not arrest him for resisting arrest. Indeed, Clark emphasized that Biedma was not under arrest and left him with a detention certificate. Clark Decl. Ex. I, Detention Cert.; Ex. J, Incident Report ("Biedma was upset and stated that the only thing he had been told was that he had been arrested. I told Beidma [sic] that he was not under arrest and as soon as he was done being treated he could leave."). The fact that Clark did not arrest Biedma on the spot may undermine Clark's subsequent assertion that he believed Biedma had committed a criminal offense. Santa Rosa Penal Code Section 849 precludes officers from releasing an individual without taking him before a magistrate except in three circumstances: (1) insufficient grounds to make a criminal complaint against the person arrested; (2) the person was arrested for intoxication only; or (3) the person was arrested

---

[6] Clark testified that he first saw Biedma from about fifteen to twenty feet away, but that he released Taz when Biedma was six to three feet away. *See* Tr. Criminal Trial at 57:5-7, 76:2-7.

for being under the influence of a narcotic. *See* Clark Decl. Ex. I, Detention Cert. (citing Santa Rosa Penal Code § 849). The only exception applicable to Biedma on April 7 was that there were insufficient grounds to file a criminal complaint against Biedma. That Clark changed his mind between releasing Biedma and filing his incident report at the very least calls into question the conclusions contained within it.

Clark's videotaped conversation with Biedma immediately after the incident, and Biedma's statements shortly after the event also comprise relevant evidence.[7] Biedma vehemently denies Clark's version of events in the video and continued to deny those events throughout the criminal prosecution, as well. Discrepancies also exist between Clark's account of the hospital conversation and what appears on the video. For example, while Clark wrote that Biedma knew the people who shone a light on him were officers, Biedma makes no such admission on the video. *Compare* Clark Decl. Ex. J., Incident Report, *with* Clark Decl. Ex. H, Tr. Interrogation. Furthermore, Clark apparently thought Biedma responded to the command to get on the ground by saying, "Fuck you." Tr. Interrogation at 3:3-5. Biedma denied that he said that—or anything at all. *Id.* at 3:3-6. In the incident report, however, Clark's version adjusts somewhat: "Biedma said something to me . . . . I could not make out what he said." Clark Decl. Ex. J, Incident Report. A jury could reasonably conclude that Clark's narrative about the incident evolved, and therefore question the report's accuracy.

Biedma also suggests that Clark exaggerated whether he feared for his safety. To support this contention, he notes that SRPD has a policy that requires officers to draw their service weapons when they "reasonably believe[] it may be necessary to use a firearm . . . when . . . there exists a possibility of death or serious bodily injury to the officer or other persons." Grady Decl. Ex. 8, SRPD Policy No. 304.4(a)(2). However, Clark did not draw his service weapon, Clark Dep. at 115:24-116:16, and Gillote did not mention drawing his weapon in his incident report.[8]

---

[7] Neither party has challenged the admissibility of the video or transcription of the interrogation.

[8] At his deposition, Gillote could not recall whether he drew his service weapon. Gillote Dep. at 84:8-10.

*See* Grady Decl. Ex. 6, Supp. Incident Report. A reasonable juror could conclude that the officers never drew their weapons, and therefore did not actually believe that Biedma was a threat to their safety.

The disputed facts about what occurred right before Taz bit Biedma matter. If the jury believes Biedma's version of events, then he has made a claim of malicious prosecution. Should the jury accept Clark's version of events, then Biedma's malicious-prosecution claim will fail. Importantly, Biedma has pointed to evidence in the record that may cause the jury to question Clark's version of events. Accordingly, the motion for summary judgment must be denied.

*4. Warrantless Entry onto Biedma's Property*

Biedma avers that defendants violated the Fourth Amendment by entering into the side yard without a warrant. The Fourth Amendment provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "[T]he government conducts a search within the meaning of the Fourth Amendment when it 'physically occupies private property for the purpose of obtaining information.'" *Patel v. City of Montclair*, 798 F.3d 895, 898 (9th Cir. 2015) (*United States v. Jones*, 132 S. Ct. 945, 949 (2012)) (internal alteration omitted). "[A] mere trespassory entry onto private property does not constitute a search." *Id.* Rather, trespass onto private property violates the Fourth Amendment "only with regard to those items ('persons, houses, papers, and effects') that it enumerates." *Jones*, 132 S. Ct. at 953 n.8.

The protections that the Fourth Amendment provides the home extend to the curtilage, "defined . . . by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." *Oliver v. United States*, 466 U.S. 170, 180 (1984).[9] Those factors include: "the proximity of the area claimed to be

---

[9] Defendants insist that criminal cases addressing the scope of the Fourth Amendment are merely persuasive authority and not binding in the context of a § 1983 suit. Def. Reply Br. at 7. The Supreme Court, however, has never held that the Fourth Amendment is broader when a person challenges officers' actions in a motion to suppress evidence than in a civil rights lawsuit. Indeed,

ORDER REGARDING MOTION FOR SUMMARY JUDGMENT
CASE NO. 14-cv-02853-RS

12

curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Id.* at 300.

There is little dispute that Clark and Gillote entered the curtilage of Biedma's property. In the incident reports and at the criminal trial, both Gillote and Clark stated that they were in the side yard at 927 Saracen. Tr. Criminal Trial at 12:17-24, 14:15. Diagrams of the scene indicate that Gillote and Clark were in the side yard. *See* Clark Decl. Ex. E. At trial, Gillote testified that he was standing next to the garage, which is on the property.[10] Tr. Criminal Trial at 25:2-11. The fences along the side of the yard create an enclosure around the home and create a barrier between the property and the public street. In addition, there were many trees in the side yard that obstruct clear views into the home. *Id.* at 12:17-24, 14:1-5. From these facts, a reasonable juror could easily conclude that Biedma expected the side yard to remain private.

Indeed, defendants concede that Clark and Gillote entered the curtilage without a warrant. *See* Defs.' Reply Br. at 7. Nevertheless, they argue that they did not need a search warrant to enter into the curtilage because they did not search the property. However, an officer need not actually search the home or the curtilage to violate the Fourth Amendment; physical occupation of a protected space is sufficient. *Patel*, 798 F.3d at 898. As such, because Clark and Gillote did not have a warrant, they must identify an exception to the warrant requirement to justify entry into the curtilage of Biedma's home.

They contend that there were exigent circumstances—namely hot pursuit of a fleeing felon—to justify the entry. Officers may enter a home when "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable

---

when addressing whether officers violated a civil plaintiff's rights, the Supreme Court routinely references criminal cases. *See, .e.g.*, *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. ct. 2074, 2080-81 (2011) (citing civil and criminal cases to address the scope of the exceptions to the warrant requirement); *Pearson v. Callahan*, 555 U.S. 223, 244 (2009) (citing criminal cases addressing the consent-once-removed doctrine).

[10] At his deposition, Gillote denied that he was in the side yard. Gillote Dep. at 57:13-17.

under the Fourth Amendment." *United States v. Struckman*, 603 F.3d 731, 743 (9th Cir. 2010) (internal quotation marks omitted). The Ninth Circuit has "defined those situations as (1) the need to prevent physical harm to the officers or other persons, (2) the need to prevent the imminent destruction of relevant evidence, (3) the hot pursuit of a fleeing suspect; and (4) the need to prevent the escape of a suspect." *Id.*

While defendants contend that each situation is applicable here, only the fourth ground provides the basis for their warrantless entry onto Biedma's land. Clark and Gillote have not presented any evidence that would have lead them to believe they had to stand in Biedma's side yard to prevent physical harm to others or the destruction of evidence. "'[H]ot pursuit' means some sort of chase." *United States v. Santana*, 427 U.S. 38, 42-43 (1976). Absent an active chase, police officers may not enter property without a warrant. *See Struckman*, 603 F.3d at 744 ("There was no chase here—no "pursuit" of Struckman, hot or cold.").

Clark and Gillote have, however, provided reason to believe they needed to stand in the side yard to prevent Diaz's escape. Clark declares that he knew Diaz was inside 950 Kingwood and that an informant indicated that Diaz would try to escape from the back door. Clark Decl. ¶ 7. Clark, Gillote, and Taz were positioned to block this expected escape route while other SRPD officers knocked on Diaz's front door. These are "specific articulable facts" that justify Clark's decision to stand where he did. *Struckman*, 603 F.3d at 743. Accordingly, no reasonable juror could conclude that defendants' entry into the curtilage of Biedma's home violated the Fourth Amendment and summary judgment must be entered for defendants on that aspect of the Fifth Claim for Relief.

### C. Claim 5: Fifth and Sixth Amendment Violations

As part of the Fifth Claim for Relief, the SAC includes a claim for violations of the Fifth and Sixth Amendments based on the theory that Biedma was in custody in the hospital when he and Clark spoke. Biedma now concedes that he cannot prevail on these claims, and so summary judgment is entered for defendants with respect to this theory of liability in Claim 5.

### V. CONCLUSION

Because defendants have demonstrated that no reasonable jury could conclude they violated the Fourth Amendment when they entered the curtilage of Biedma's home to prevent Diaz's escape, their motion for summary judgment must be granted with respect to this aspect of his Fifth Claim for Relief.  Moreover, because Biedma concedes that he cannot prevail on claims of Fifth and Sixth Amendment violations, summary judgment must be entered in defendants' with respect to those theories of liability.  Biedma has demonstrated that material disputes of fact remain with respect to his claims for unreasonable seizure, false imprisonment, and malicious prosecution.  Accordingly, defendants' motion for summary judgment must be denied with respect to those claims.

**IT IS SO ORDERED**.

Dated:  December 18, 2015

_____
RICHARD SEEBORG
United States District Judge